FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

03 JAN 29 PM 3: 42

U.S. DISTRICT COURT
N.D. OF ALABAMA

BRINDA BOULDIN,                          )
                                         )
     Plaintiff,                        )
                                         )
     vs.                               )          Civil Action No. CV-00-S-1577-NE
                                         )
CELLCO PARTNERSHIP, d/b/a                )
Verizon Wireless,                        )
                                         )
     Defendant.                        )

ENTERED

JAN 2 9 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

MEMORANDUM OPINION

Plaintiff, Brinda Bouldin, alleges that her former employer, Cellco Partnership, doing business as Verizon Wireless, subjected her to unlawful discrimination on the basis of her race (African American) and sex (female), and then retaliated against her for complaining about such discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.  The case presently is before the court on three motions, all filed by the defendant:  (i) motion for summary judgment; (ii) motion to strike certain exhibits submitted by plaintiff in opposition to summary judgment; and (iii) motion for leave to file a reply brief.[1]

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of

---

[1] Doc. nos. 41, 47, and 50, respectively.



summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that: (i) defendant's motion for leave to file a reply brief is due to be granted; (ii) defendant's motion to strike is due to be denied in part and deemed moot in part; and (iii) defendant's motion for summary judgment is due to be denied, except as to those claims abandoned by plaintiff, discussed in § II(B)(1) *infra* — *i.e.*, plaintiff's discriminatory failure-to-promote claims, relating to positions in Ohio, Virginia, Florida, and the Hughes Road store manager position, and her retaliation claims — all of which are due to be dismissed with prejudice for failure to prosecute.

## I. SUMMARY OF FACTS

### A.   Plaintiff's Employment by Defendant

Plaintiff initially was hired by defendant[2] as a temporary employee on October 7, 1996.[3] The following year, on March 26, 1997, she became a part-time retail sales associate at defendant's store located on Hughes Road in Madison, Alabama.[4]  Plaintiff sold wireless telephone services and related products. Her compensation consisted of a base hourly pay scale, plus commissions on sales for which she was responsible.[5]  Plaintiff remained a part-time sales associate until her employment

---

[2] To be correct, it should be noted that plaintiff actually began working for GTE Wireless Holdings, L.L.C., the organizational predecessor to defendant Verizon Wireless. *See* Jon Luecke Deposition ("Depo.") at 5.  The parties do not attach any particular significance to the organizational change for purposes of analyzing plaintiff's claims in this action, however, and this court therefore will not draw any distinction between the two entities, but instead will refer to both by use of the singular term "defendant."

[3] Plaintiff's EEOC Charge, Exhibit A to Plaintiff's Evidentiary Submission, at 1 ("EEOC Charge"); Plaintiff's Depo. at 26.

[4] EEOC Charge; Plaintiff's Depo. at 26-29; Exhibit 2 to Plaintiff's Depo.

[5] Plaintiff's Depo. at 29.

was terminated on October 15, 1998.[6]

Plaintiff's initial supervisor at the Hughes Road store was Chris Prince, who was the store manager.[7]  During April of 1998, however, Prince was replaced by Oscar McCants, an African American male who had been hired from outside the company.[8]  During the period relevant to plaintiff's claims, there were two other sales associates regularly assigned to the Hughes Road store, Larry Waldrup and David Twilley,[9] both of whom were Caucasian males.[10]  All sales associates were paid the same base hourly rate.[11]

## B.    Scheduled Work Hours

Although plaintiff and David Twilley were classified as part-time employees during the period that defendant employed both of them, plaintiff noticed, beginning in May or June of 1998, that Oscar McCants often scheduled Twilley to work more hours than she worked.[12]  Defendant's records generally support this contention, showing that:  plaintiff and Twilley were employed by defendant during the first twenty-two of the twenty-six bi-weekly pay periods of calendar year 1998;[13] of those, Twilley was paid for working more hours than plaintiff during  twelve of the

---

[6] EEOC Charge.

[7] Plaintiff's Depo. at 28.

[8] *Id.* at 28, 41, 68, 155; McCants's Depo. at 11, 16; McCants's Decl. ¶1.

[9] Defendant's Response to Plaintiff's First Interrogatories, Exhibit B to Plaintiff's Evidentiary Submission, ("Plaintiff's Exhibit B") at 3, 6.

[10] *Id.*

[11] *See id.*.; *see also* Exhibit K to Plaintiff's Evidentiary Submission.

[12] Plaintiff's Depo. at 208-10.

[13] Exhibit E to Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment. ("Plaintiff's Exhibit E").  Defendant has moved to strike Plaintiff's Exhibit E (doc. no. 47) at 7-8, 16-17.  However, the basis for defendant's motion is not clear.  Defendant apparently contends that Plaintiff's Exhibit E, which consists of defendant's own records showing the number of paid hours for plaintiff and David Twilley during the relevant time periods, is inadmissible to show that Twilley was placed in a full-time position after plaintiff's termination because plaintiff acknowledges that she lacks personal knowledge that Twilley was actually promoted to a full-time position.  While the court agrees that plaintiff's lack of personal knowledge as to whether Twilley was promoted to a full-time position would prevent her from establishing such fact *through her own testimony, see* Fed. R. Civ. P. 56(e); *Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir. 1999), the court fails to see how plaintiff's personal knowledge of any fact

twenty-six pay periods (*i.e.*, pay periods numbered 1-3, 6-7, 12, 14, 16-18, 20, and 22), while plaintiff was paid for more hours during ten of the twenty-six pay periods (Nos. 4-5, 8-11, 13, 15, 19 and 21).[14]  Moreover, upon completion of the twenty-second pay period, Twilley had been paid for 131 more hours than plaintiff.[15]

It should be noted, however, that plaintiff was terminated during the twenty-second pay period, during which she was paid for working only 15.5 hours, while Twilley worked the entire pay period and was paid for 63.25 hours.[16]  Even if that final pay period is disregarded for purposes of comparison, Twilley still was paid for 83.25 more hours than plaintiff during the twenty-one complete pay periods that he and plaintiff worked for defendant.[17]  Specifically, plaintiff was paid for 24.75 more hours than Twilley through the eleventh pay period (*i.e.*, more hours than Twilley in the eighth, ninth, tenth, and eleventh pay periods).[18]  Moreover, in the twelfth pay period, which appears to have begun during June of 1998,[19] Twilley was paid for 135 hours, while plaintiff was paid for only 83.50 hours. Twilley continued to work a greater number of hours than plaintiff every

---

bears on the admissibility of employee work records created by defendant. Thus, defendant's motion to strike is due to be denied with respect to Plaintiff's Exhibit E.

    Defendant's also seeks to exclude from the court's consideration Exhibits F through M of plaintiff's evidentiary submission. However, upon review of these exhibits, the court concludes that they would not alter the court's resolution of defendant's motion for summary judgment. Therefore, the court deems defendant's motion to strike moot as it relates to Exhibits F through M of plaintiff's evidentiary submission. Should this action proceed to trial, defendant may renew its objection to their admissibility, through a motion in limine or contemporaneously with an offer at trial.

    [14]Plaintiff's Exhibit E.

    [15]*Id.*

    [16]*Id.*  In none of the previous twenty-one pay periods for 1998 had plaintiff been paid for less than thirty-three hours (except for pay period 18, during which she was paid for 30 hours of vacation). She averaged just over seventy hours in those same pay periods. *Id.*

    [17]*Id.*

    [18]*Id.*

    [19]Plaintiff's Exhibit E does not expressly state the beginning or ending date of each pay period. However, defendant suggests that pay period 10 roughly corresponds with the month of May of 1998. *See* Defendant's Reply (attached to doc. no. 50) at 6. Assuming that the first pay period of the year commenced on January 1, 1998, pay period 12 would have begun on June 4th (11 prior pay periods x 14 days each + 1 day).

pay period thereafter, until plaintiff's termination on October 15, 1998.[20]

Plaintiff asked McCants during an employee meeting why he scheduled Twilley to work more hours than she had worked.[21]  McCants answered that Twilley "was getting married and he needed the money so therefore he was given more hours."[22]  (Twilley married during October of 1998.[23])

## C.    Plaintiff Seeks a Full-Time Position

A full-time sales position became available at the Hughes Road store during May of 1998.[24] Plaintiff alleges that she formally applied for, and, on several occasions, verbally expressed interest in, the position.[25]  In particular, she contends that she talked to supervisory personnel employed by defendant — Jon Luecke, a white male, and then-General Manager of Retail Sales for North Alabama, and, Maurice Cabble, an African American male supervisor in defendant's human resources department — about her interest in the full-time position.[26]  Plaintiff also claims that she discussed her interest with McCants several times.  While attending a company sales meeting in Gatlinburg, Tennessee from May 27 through 29, 1998,[27] for example, she told McCants "how long [she] had been working with the company and a full-time position was available and [she] wanted to be considered for it."[28]  McCants replied that "he was working on it," but that "[h]e wasn't . . . sure . . . how the procedure goes but he would get to the people that could tell him how the

---

[20] Plaintiff's Exhibit E.

[21] Plaintiff's Depo. at 208-10.

[22] *Id.*

[23] *Id.* at 210.

[24] *Id.* at 69-70.

[25] *Id.* at 68-69; *see also id.* at 40, 43.

[26] *Id.* at 69.

[27] *Id.* at 68.

[28] *Id.*

5

procedure worked and he would let [her] know."[29]  Plaintiff followed up with McCants during June

or July of 1998, but McCants again told plaintiff that he would "let [her] know."[30]  Plaintiff avers

that she raised the issue of full-time employment a third time with McCants, "[p]robably [at] the end

of July or maybe somewhere in August" of 1998.[31]  On this occasion, McCants told her that "he

wasn't . . . sure who he was going to give the full-time position to, either [plaintiff] or David

Twilley," but that "he preferred David to have it because he was getting married and he needed the

money."[32]  Plaintiff states that, a short time later, sometime during the second week of August of

1998, McCants also "mentioned that he didn't really care to work with black females."[33]  McCants

denies making both of the preceding statements.[34]

Plaintiff admits that neither she nor Twilley, or any other part-time sales associate, was

installed in the new, full-time position at the Hughes Road store prior to her termination on October

15, 1998.[35]  Even so, plaintiff testified during deposition that, shortly after her discharge, she was

told that Twilley had been promoted to a full-time position.[36]  Defendant's employee records include

paid hours for Twilley from the final pay periods of 1998 through the seventeenth pay period of

calendar year 1999.[37]  Those records show that, during the first pay period following plaintiff's

termination (the twenty-third), Twilley worked twenty-seven regular hours, and he received another

---

[29]*Id.* at 70.

[30]*Id.* at 71.

[31]*Id.* at 71-72.

[32]*Id.* at 72.

[33]*Id.* at 72-73.

[34]McCants's Depo. at 15, 17.  McCants did not recall: (1) that plaintiff ever expressed to him her interest in a full-time position, although he acknowledged she might have done so; (2) that there was a plan to add a full-time position at the Hughes Road store during this period; or (3) that plaintiff and Twilley were competing for such a position. *Id.* at 13-15.  McCants also denied that he dislikes working with black females.  *Id.* at 17.

[35]Plaintiff's Depo. at 74.

[36]*Id.*

[37]*See* Plaintiff's Exhibit E.

6

twenty-five hours of paid leave: *i.e.*, a total of 52 hours over the two-week pay period, a part-time schedule.[38]  In the twenty-fourth bi-weekly pay period of calendar year 1998, Twilley worked just 59.5 hours: again, a part-time schedule.[39]  During the final two pay periods of 1998, however, as well as during fifteen of the first seventeen bi-weekly pay periods of calendar year 1999, Twilley was paid for eighty or more hours (*i.e.*, about 89% of the time).[40]  In contrast, during the time that they both were undisputedly classified as part-time employees, Twilley had been paid for at least 80 hours in only six of the first twenty-four pay periods of 1998 (or 25% of the time), while plaintiff had been paid for at least 80 hours in only six of the first twenty-one pay periods of 1998 (or about 29% of the time).[41]

## D.    Plaintiff's Termination

It is undisputed that, during most of plaintiff's tenure, defendant perceived no problems with her work performance.[42]  During the fall of 1998, however, more seasoned store managers alerted McCants that his sales associates were completing sales tickets incorrectly, and that he should request defendant's security department to investigate.[43]  McCants contacted Mark Brower, a security official employed by defendant, who came to the Hughes Road store for approximately one week during September of 1998, and reviewed sales transactions.[44]  Brower's investigation confirmed that the store's sales associates were incorrectly writing and processing sales tickets.[45]

---

[38]*Id.*  According to plaintiff, Twilley was married during the month of October of 1998, which is consistent with defendant's records reflecting his paid vacation during that period.

[39]*Id.*

[40]Plaintiff's Exhibit E.

[41]*Id.*

[42]*See* McCants's Depo. at 12-13; Plaintiff's Depo. at 244.

[43]McCants's Depo. at 18-19.

[44]*Id.* at 18-23; Plaintiff's Depo. at 93.

[45]McCants's Depo. at 21-22.

On September 21, 1998, Brower and McCants met individually with plaintiff, Twilley, and Waldrup to explain and discuss the ticketing errors that had been discovered.[46]

Brower concluded his investigation by submitting copies of a report to Mollie Hollister, a Caucasian female who had replaced Jon Luecke as McCants's immediate superior in late Spring of 1998, and to Maurice Cabble in the human resources department.[47] McCants, Hollister, and Cabble concluded that the manner in which plaintiff and the other sales associates at the Hughes Road store had been completing and processing sales tickets in the company's computer system not only was contrary to company procedures, but also had resulted in those associates receiving unearned sales commissions, and, in customers receiving unauthorized, "air-time" credits — both consequences thereby depriving the company of revenue.[48] McCants, Hollister, and Cabble nevertheless decided to give the associates the benefit of the doubt — to assume that the failures to follow procedures had been honest errors[49] — and to impose no disciplinary sanction, other than presenting each associate with a performance improvement plan ("PIP"). The purpose of the PIP was to advise each sales associate that her or his job performance had been found deficient in specific respects, and to caution that continued errors might result in more tangible corrective action, up to (and including) termination.[50]

On October 7, 1998, McCants met separately with plaintiff, Twilley, and Waldrup, to present each her or his respective PIP.[51] Each document was almost identical, and stated that the associate had improperly used "POS [Point-of-Sale] star codes," which had resulted "in the payout of

---

[46]*Id.* at 21-22; *see also* Exhibit 1 to McCants's Depo.; Plaintiff's Depo. at 93.

[47]McCants's Depo. at 23.

[48]*Id.;* Exhibits A, B, and C to McCants's Decl.

[49]McCants's Depo. at 23.

[50]*Id.*; Exhibits A, B, and C to McCants's Decl.

[51]*See id.* Plaintiff's Depo. at 92-93, 95-98; McCants's Depo. at 24-25.

hundreds of dollars in unearned commissions."[52]  Plaintiff's PIP cited her for several "[i]mproper ticketing procedures," including:  (1) "The failure to ticket out phones when sold"; (2) "Selling phones at the wrong price or giving them away without authorization"; (3) "Failure to extend customer contracts when *cpe[53] [sic] promo was used"; (4) "The use of *CPE on the same ticket when sell[ing] a phone from POS"; and (5) "Adding enhanced services star codes to tickets at the point of the initial sale when these services are included in the rate plan."[54]  Twilley and Waldrup were cited in their respective PIPs for some of the same or related infractions.[55]

When McCants presented Twilley and Waldrup their respective PIP, each signed his document without incident.[56]  Plaintiff was another case entirely.  When McCants presented plaintiff's PIP, she refused to sign it, and demanded to speak with Mollie Hollister in the human resources department.[57] (At that time, plaintiff was not aware of the fact that, even though each PIP had been *signed* by McCants, the documents actually had been *prepared* by Hollister for McCants's signature.)  Plaintiff further accused McCants of discriminating against her, because he wanted Twilley to be promoted to a full-time position rather than her, and stated that she intended to speak with Hollister about that issue as well.[58]

Eight days later, on October 15, 1998, McCants met with plaintiff in his office, and told her that her employment was being terminated for "violating company policy."[59]  When plaintiff

---

[52]Exhibits A, B, and C to McCants's Decl.

[53]"Customer Provided Equipment."  Plaintiff's Evidentiary Submissions in Opposition to Defendant's Motion for Summary Judgment (doc. no. 45), Ex. B, at 13.

[54]Exhibit A to McCants's Decl.

[55]Exhibits B and C to McCants's Decl.

[56]McCants's Depo. at 24-25.

[57]Plaintiff's Depo. at 95-97.

[58]*Id.* at 97-99.  McCants denies being able to recall that plaintiff made any claim with respect to race or sex during this meeting on October 7, 1998.  McCants's Depo. at 26.

[59]Plaintiff's Depo. at 110.

9

inquired which policy she had violated, McCants said that he was not required to tell her.[60]  Plaintiff then asked whether anyone else had participated in the decision to discharge her, and McCants said that "it was being done in consensus with Mollie Hollister and Maurice Cabble."[61]  Plaintiff immediately requested that McCants telephone Hollister, but he said he could not do so, because Hollister was out of town.[62]  Plaintiff then asked McCants to telephone Cabble, which he did.[63]  After McCants handed her the telephone receiver and left the room, plaintiff asked Cabble why she was being fired.[64]  According to plaintiff, after a very long pause, Cabble said he did not know anything about it.[65]  Plaintiff claims that she telephoned Hollister the next morning, to ask why she was being fired, and that Hollister expressed surprise to hear of her termination.[66]

McCants testified during his deposition that, after presenting plaintiff, Twilley, and Waldrup with their respective PIPs, he had performed a "random spot check" of the sales tickets processed by the store's sales associates.[67]  From this review, McCants discovered that plaintiff, but not the other two associates, had continued to violate company sales ticket processing procedures.[68]  Specifically, McCants says that he found plaintiff had violated company ticketing procedures in connection with a customer transaction that occurred on October 12, 1998, in which plaintiff improperly credited a customer's account in the amount of fifty dollars, and processed an

---

[60]*Id.* at 129-30.  McCants suggests that he is "sure" he told plaintiff that her termination "had to do with the ticket writing . . . ."  McCants's Depo. at 49.

[61]*Id.* at 130.

[62]*Id.*

[63]*Id.*; McCants's Depo. at 49-50.

[64]Plaintiff's Depo. at 130-32; *see also* McCants's Depo. at 49-50.

[65]Plaintiff's Depo. at 131-32.

[66]*Id.* at 129.

[67]McCants's Depo. at 27-28.

[68]*Id.* at 27-29.

unnecessary phone line activation.[69] McCants contends that he also discovered plaintiff had violated ticketing procedures when performing a transaction the same day she was discharged, by failing to extend the service contract of an existing customer who had taken advantage of a promotional offer.[70] McCants acknowledges that he reported plaintiff's errors to Hollister,[71] but claims that he (McCants) did not participate in the decision to terminate plaintiff's employment. Instead, McCants maintains that Hollister told him that she and Cabble had jointly decided that plaintiff should be discharged, and instructed McCants to implement their decision.[72]

## II. DISCUSSION

### A.   Plaintiff's Claims

#### 1.   Race and sex discrimination

Plaintiff grounds her racial discrimination claims on Title VII and 42 U.S.C. § 1981, and her gender discrimination claims on Title VII.[73] She avers that defendant denied her promotions and full-time employment,[74] terminated her employment,[75] and "otherwise treated [her] differently than . . . white, male employees in the terms and conditions of her employment."[76] When questioned

---

[69]*Id.* at 36-44; Exhibits 1 & 4 to McCants's Depo.

[70]McCants's Depo. at 44-45; Exhibits 1 & 5 to McCants's Depo.

[71]McCants's depo. at 47-48.

[72]*Id.* at 47-49.

[73]The principal anti-discrimination provision of Title VII makes it an "unlawful employment practice for an employer . . to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individuals's race . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 likewise prohibits certain forms of discrimination based upon race, but not upon sex, by guaranteeing to all persons in the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Following the passage of the Civil Rights Act of 1991, the term "make and enforce contracts" is broadly defined as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

[74]Second Amended Complaint (doc. no. 12) (hereinafter "Complaint") ¶ 10.

[75]*Id.* at ¶ 12, 13

[76]*Id.* at ¶ 11.

11

during her deposition about which employment actions, aside from denial of a full-time position and termination of her employment, form the basis of her Title VII and § 1981 claims, plaintiff responded that she also complained of being scheduled by McCants to work fewer hours than David Twilley because of her race or sex (or both).[77]  She also mentioned failure-to-promote claims regarding positions with defendant in Ohio, Virginia, and Florida, as well as the Hughes Road store manager position awarded to McCants during April of 1998.[78]

### 2.    Retaliation

Plaintiff's retaliation claim is bottomed on the allegation that defendant terminated her "due to . . . her repeated complaints about racial discrimination and harassment," and that such termination occurred "[i]mmediately after [she] indicated to her supervisor [that] she intended to report . . . discrimination based on her race and sex to other management level employees."[79] Defendant argues in its motion for summary judgment that such allegations are insufficient to state a claim for unlawful retaliation under Title VII or § 1981.

In this circuit, Title VII and § 1981 both support claims of unlawful retaliation.  Title VII contains an express anti-retaliation ban, which prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made unlawful by [Title VII] . . . ." 42 U.S.C. § 2000e-3(a).  Section 1981, on the other hand, does not contain a similar express proscription against retaliatory conduct.  Even so, the Eleventh Circuit has concluded that retaliation claims asserted in a racial discrimination context, and arising after the effective date of the 1991 Civil Rights Act, generally are cognizable under § 1981. *See, e.g., Webster v. Fulton County,* 283

---

[77]Plaintiff's Depo. at 208-10.

[78]*See id.* at 40-41, 44-64.

[79]Complaint ¶¶ 12, 13.

12

F.3d 1254, 1256 (11th Cir. 2002); *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1412-13 (11th Cir. 1998).

**B.    Defendant's Motion for Summary Judgment**

    **1.    Claims deemed abandoned**

Defendant has moved for summary judgment on all of plaintiff's claims.  At the outset of discussion, the court notes that, while plaintiff has offered arguments in opposition to some of the defendant's contentions, she has failed to do so regarding others.  Specifically, plaintiff has failed to respond to defendant's contentions that her discriminatory failure-to-promote claims relating to positions in Ohio, Virginia, and Florida, and the Hughes Road store manager position are foreclosed by the two-year statute of limitations applicable to § 1981 claims brought in Alabama,[80] and that her Title VII claims are both untimely and outside the scope of her EEOC charge.  *See* 42 U.S.C. § 2000e-5(e)(1); *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1220 (11th Cir. 2001); *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994).  Likewise, plaintiff fails to offer any argument in opposition to defendant's assertion that it is entitled to summary judgment on plaintiff's retaliation claims because:  (1) the complaint fails to state a retaliation claim; (2) plaintiff cannot show that she engaged in protected activity for purposes of establishing a prima facie case of retaliation; and (3) plaintiff cannot show the requisite causal link between protected activity and her termination.

Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g., Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting

---

[80]*See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998).

their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).[81]

Accordingly, this court finds that plaintiff has abandoned her retaliation claims, along with her failure-to-promote claims regarding the positions in Ohio, Virginia, and Florida, and the Hughes Road store manager position, and that defendant's motion for summary judgment is due to be granted as to these claims.

---

[81] *Cf., e.g., Lucas v. W.W. Grainger, Inc.* 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted)); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

### 2.    Plaintiff's remaining discrimination claims

#### a.    Analytical framework

Plaintiff's remaining claims assert that defendant denied her a full-time position, scheduled her to work fewer hours than a similarly situated white male employee, and terminated her employment, all on the basis of her race and/or gender.  To the extent that she alleges that these employment decisions were motivated by race, she brings claims under both Title VII and § 1981.

The Eleventh Circuit has recognized that claims alleging unlawful disparate treatment in employment because of race have the same substantive proof requirements under Title VII and § 1981, and, are analyzed under the same framework.  *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1109 n.4 (11th Cir. 2001); *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

To the extent that plaintiff alleges that defendant's employment decisions were motivated by her gender, she brings claims only under Title VII.  The analytical framework applicable to claims of race discrimination also applies to claims of gender discrimination.  *See, e.g., Lynn v. Regents of University of California*, 656 F.2d 1337, 1341 (9th Cir. 1981); *Holthaus v. Compton & Sons, Inc.*, 514 F.2d 651, 652-53 (8th Cir. 1975).

#### b.    Evidentiary burdens and "direct" *versus* "circumstantial" evidence

In order to prevail on a Title VII or § 1981 disparate treatment claim, plaintiff has the burden of persuading a reasonable factfinder, by a preponderance of the admissible evidence, that she suffered an adverse employment action, or was denied a benefit that affected her compensation, terms, conditions, or privileges of employment in a material way, *see Davis v. Town of Lake Park*,

15

245 F.3d 1232, 1238 (11th Cir. 2001), and that such action by the employer was taken on the basis

of a prohibited characteristic, such as race or sex. *See McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); *Fitzgerald v. Henderson*, 251 F.3d 345, 356

(2d Cir. 2001); *Wright v. Southland Corp.*, 187 F.3d 1287, 1289-90 (11th Cir. 1999).

> Disparate treatment claims require proof of discriminatory intent either through
> direct or circumstantial evidence. *See [Harris v. Shelby County Board of Education,
> 99 F.3d 1078, 1083 (11th Cir. 1996)] (observing that a "'plaintiff must, by either
> direct or circumstantial evidence, demonstrate by a preponderance of the evidence
> that the employer had a discriminatory intent'" to prove a disparate treatment claim)
> (quoting *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir.1994)). "Direct evidence is
> evidence that establishes the existence of discriminatory intent behind the
> employment decision without any inference or presumption." *Standard v. A.B.E.L.
> Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citing *Carter v. City of Miami*, 870
> F.2d 578, 580-81 (11th Cir.1989)). Absent direct evidence, a plaintiff may prove
> intentional discrimination through the familiar *McDonnell Douglas* paradigm for
> circumstantial evidence claims. To establish a prima facie case of disparate
> treatment under this rubric, a plaintiff "must show: (1) she is a member of a
> protected class; (2) she was subjected to adverse employment action; (3) her
> employer treated similarly situated male employees more favorably; and (4) she was
> qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).
> Once these elements are established, a defendant has the burden of producing
> "legitimate, non-discriminatory reasons for its employment action." *Holifield v.
> Reno*, 115 F.3d 1555, 1564 (11th Cir.1997) (citing *Texas Dep't of Community Affairs
> v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If such a reason
> is produced, a plaintiff then has the ultimate burden of proving the reason to be a
> pretext for unlawful discrimination. *See Holifield*, 115 F.3d at 1565.

*E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) (footnote omitted).

Plaintiff contends that she has direct evidence to support each of the employment actions she

challenges. Defendant instead characterizes plaintiff's evidence as merely circumstantial. The

characterization of a plaintiff's evidence as "direct" *versus* "circumstantial" is important.

When evaluating employment discrimination claims supported by circumstantial evidence,

courts are guided by the analytical framework announced in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and then elaborated in *Texas Department of*

16

*Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S. Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094). If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, 101 S. Ct. at 1096, then the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S. Ct. at 1094-95 & n.10. In the final step of the analytical process, the plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is

17

entitled to survive summary judgment." *Combs*, 106 F.3d at 1529.

> On the other hand,
>
>> the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. See *Teamsters v. United States*, 431 U.S. 324, 358, n. 44 (1977). The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (CA1 1979).
>
> *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985).

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g., Bass*, 256 F.3d at 1111 (the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (same); *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Black's Law Dictionary* 577 (7th ed. 1999) (defining direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic is more specifically defined as

"evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)). As such, "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (per curiam).

Due to the "powerful" nature of direct evidence, the Eleventh Circuit "has marked severe limits for the kind of language [that may] be treated as direct evidence of discrimination." *Id.* (citing *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997); *Burrell*, 125 F.3d at 1393-94 & n.7; *Earley*, 907 F.2d at 1082).

> To give great weight — for example, to say a few isolated words "make all the difference" — to language that is, at best, only circumstantial evidence blurs the important distinction between circumstantial evidence and direct evidence for prima facie cases. Blurring this distinction only adds hurtful uncertainty to the law.
>
> Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case. *See Smith v. Horner*, 839 F.2d 1530, 1536-37 (11th Cir. 1988); *see also E.E.O.C. v. Our Lady of the Resurrection Medical Ctr.*, 77 F.3d 145, 149 (7th Cir. 1996); *Woody v. St. Clair Comm'n*, 885 F.2d 1557, 1560 (11th Cir. 1989).

*Jones*, 151 F.3d at 1323 n.11.

Eleventh Circuit precedent clearly establishes that only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor, will be deemed to constitute direct evidence of discrimination. *See, e.g., Damon*, 196 F.3d at 1358-59; *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999); *Earley*, 907 F.2d at 1081-82; *Carter*, 870 F.2d at 582. "If an alleged statement at best merely suggests a discriminatory motive, then it

19

is by definition only circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266 (citing *Burrell*, 125

F.3d at 1393). "An example of direct evidence would be a management memorandum saying, 'Fire

Earley — he is too old.'" *Damon*, 196 F.3d at 1359 (quoting *Earley*, 907 F.2d at 1082).[82]

Two additional points must be emphasized. First, "stray remarks in the workplace . . . cannot

justify requiring the employer to prove that its hiring or promotion decisions were based on

legitimate criteria." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 1804-05, 104

L. Ed. 2d 268 (1989) (O'Connor, J., concurring).

Second, "statements made by nondecisionmakers, or statements by decisionmakers unrelated

to the decisional process itself," do not constitute direct evidence of discriminatory intent. *Id.*;

*Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (same); *see also, e.g.,*

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 270,

97 S. Ct. 555, 566, 50 L. Ed. 2d 450 (1977) (holding that plaintiff failed to demonstrate that the

Village's Board of Trustees possessed a racially discriminatory purpose when denying plaintiff's

request for rezoning, despite the fact that members of the community who opposed such rezoning

"might have been motivated by opposition to minority groups"). "For statements of discriminatory

intent to constitute direct evidence of discrimination, *they must be made by a person involved in the*

*challenged decision.*" *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449,

1453-54 (11th Cir. 1996) (emphasis supplied); *see also Bass*, 256 F.3d at 1105 ("Only statements

---

[82] *See also Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987):

One example of direct evidence would be a scrap of paper saying, "Fire Rollins —— she is too old."
*See Williams* [*v. General Motors Corp.*], 656 F.2d [120,] at 130 [(5th Cir. 1981)]. This court found
that there was direct evidence of discrimination when an INS reviewing committee set aside a female
applicant's file without reviewing it because the two men knew the director would not consider hiring
a woman investigator. *Lewis v. Smith*, 731 F.2d 1535 (11th Cir. 1984). In these instances, the fact
that the evidence exists, by itself, proves the discrimination. The evidence at issue here, on the other
hand, suggests discrimination. The trier of fact must infer discrimination based on the evidence. By
definition, then, it is circumstantial evidence.

by the person involved in the decisionmaking process, here the interview panel members, could constitute direct evidence of discrimination."); *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998) ("A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination.") (citing *Mauter v. The Hardy Corp.*, 825 F.2d 1554, 1557 (11th Cir. 1987)); *Eiland v. Trinity Hospital*, 150 F.3d 747, 751-52 (7th Cir. 1998) (rejecting plaintiff's attempts at imputing racial animus of co-worker to decisionmaker).

In summary, "[t]o amount to direct evidence, a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

Keeping in mind the above evidentiary burdens and standards, the court now turns to plaintiff's remaining claims of unlawful discrimination.

### c.   Plaintiff's failure-to-promote claims

Plaintiff first alleges that defendant failed to promote her to a full-time position because of her race or sex (or both).[83] The parties dispute whether plaintiff can produce direct evidence of discriminatory intent with regard to these claims. Plaintiff claims that McCants's statements that Twilley was "getting married and he needed the money," taken together with McCants's preferential treatment of Twilley by scheduling him to work more hours than plaintiff and, ultimately, by offering him a full-time position, are direct evidence that defendant failed to promote plaintiff to a full-time position based on her sex. Plaintiff similarly suggests that McCants's statement that "he didn't really care to work with black females" is direct evidence of both race and sex discrimination.

---

[83] This claim is distinct from plaintiff's claim that defendant discriminatorily failed to promote her to positions in Ohio, Virginia, Florida, and the Hughes Road store manager position discussed in § II(B)(1) *supra*.

This court agrees with both of plaintiff's arguments. *See Taylor v. Runyon*, 175 F.3d 861, 867-68 & n.2 (11th Cir. 1999) (strongly suggesting that the comments of a decision-maker, explaining that a male employee was promoted over the female plaintiff because of family obligations and corresponding financial needs — *i.e.*, the male employee "has a family, he's got a wife, he's got three children and . . . one of [his] children . . . just had an operation of some sort" — amounted to direct evidence of an intent to discriminate on the basis of gender); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563 (11th Cir. 1985) (holding that a comment by one decision-maker that "he saw no reason for a woman to have a second job," and by another official who selected a male for a full-time position denied to the female plaintiff that "those males had families and needs that the plaintiff did not have," constituted direct evidence of sex discrimination).

### d.   Discriminatory assignment of work hours

Plaintiff also claims that defendant unlawfully discriminated against her on the basis of her race or sex (or both) because, beginning in May or June of 1998, McCants scheduled her to work fewer work hours than Twilley, a similarly-situated Caucasian male. For the reasons discussed in the preceding section, McCants's statements constituting direct evidence mandate that summary judgment be denied as to this claim, as well.

### e.   Discriminatory discharge

#### i.   Direct evidence

Plaintiff claims that McCants terminated her employment because of race or sex (or both). Defendant contends that Hollister and Cabble made the decision to terminate plaintiff's employment after McCants informed them that plaintiff continued to incorrectly process sales tickets, even after being counseled on the matter. More specifically, McCants claims that plaintiff violated company

22

ticketing procedures on October 12, 1998, when she improperly credited a customer's account fifty dollars and processed an unnecessary phone line activation. While McCants denies that he took part in the decision to terminate plaintiff's employment, this fact is in dispute, and must be drawn in a light most favorable to plaintiff. Assuming that McCants was a decisionmaker as to plaintiff's termination, his comments identified as direct evidence in II(B)(2)(c) *supra* would similarly be direct evidence of his discriminatory animus regarding the decision to terminate plaintiff's employment. Accordingly, summary judgment must be denied as to plaintiff's termination claim. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001) (mixed-motive defense has been overruled and limited in discrimination cases based on sex and race) (citation omitted).

### III. CONCLUSION

Based on the foregoing, the court concludes as follows. Defendant's motion for leave to file a reply brief (doc. no. 50) is due to be granted. Defendant's motion to strike (doc. no. 47) is due to be denied in part, as it pertains to Exhibit E of Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment, but otherwise is deemed moot. Finally, defendant's motion for summary judgment (doc. no. 41) is due to be denied, except as to those claims abandoned by plaintiff discussed in § II(B)(1) *supra*. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this **29**th day of January, 2003.

United States District Judge

23